**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

　　　　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　No. CR 13-2379 JB

JOHANNES "JOHN" JARVIS and
JOHN A. "JACK" HOPE,

　　　　　Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on: (i) Defendant John A. Hope's Supplemental Objections to the Presentence Investigation Report Regarding Loss, filed October 20, 2015 (Doc. 112)("Objections"); and (ii) Defendant Johannes "John" Jarvis' Notice of Joinder in Defendant Jack Hope's Objection to the Presentence Report, filed October 21, 2015 (Doc. 114). The Court held a sentencing hearing on November 5, 2015. The primary issues are: (i) how the Court should calculate, under § 2B1.1 of the United States Sentencing Guidelines, the intended loss to the victim, Kinesio USA, LLC, that resulted from the Defendants' conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349; and (ii) whether, after the intended loss is properly calculated, the Court should enhance the offense level by 16 levels, as the Plaintiff United States of America and the United States Probation Office ("USPO") suggest, or by 14 levels, as the Defendants suggest. The Court will not apply a 14-level enhancement by calculating the loss under § 2B1.1 as the Defendants suggest for two reasons. First, the USPO's loss calculation appropriately captures Kinesio USA's loss, while using the Defendants' method improperly calculates the value of the Defendants' services to Kinesio USA. Second, the

intended loss figure does not substantially overstate the seriousness of the offense.  Thus, the Court overrules the Defendants' Objections.

## FACTUAL BACKGROUND

This Memorandum Opinion and Order sets forth the Court's essential findings of fact. The Court takes its facts from the Presentence Investigation Report for John A. "Jack" Hope, disclosed October 30, 2015 ("PSR") and the Presentence Investigation Report for Johannes "John" Jarvis, disclosed October 30, 2015.  Because the two PSRs are substantially similar and the Defendants' Objections refer to Hope's PSR, the Court will cite to Hope's PSR when referencing both of the Defendants.

### 1. **The Contract.**

1.      Kinesio USA, an Albuquerque, New Mexico based company, "sells therapeutic elastic tape which is applied to the skin and provides support for muscles, ligaments, and joints." PSR ¶ 10, at 5.

2.      In 2003, Kinesio USA hired Jarvis to serve as Kinesio USA's Marketing Director. See PSR ¶ 11, at 5; id. ¶ 75, at 18.

3.      Jarvis' employment agreement prohibited him from diverting business opportunities to himself and required him to work in Kinesio USA's best interest.  See PSR ¶ 11, at 5.

4.      In late 2007, Kinesio USA's Vice President Tomoko Kase assigned Jarvis to find a new manufacturer for Kinesio USA's tape.  See PSR ¶ 12, at 5; id. ¶ 75, at 18.

5.      Jarvis' business acquaintance, Hope, located a manufacturer in China.  See PSR ¶ 12, at 5; id. ¶ 75, at 18.

6.       Jarvis and Hope then formed a company, Grace International, "to act as a middleman between Kinesio USA and the manufacturer in China."  PSR ¶ 12, at 5.  See ¶ 76, at 18.

7.       Concealing their involvement in Grace International, Jarvis and Hope led Kinesio USA to enter into a contract with Grace International, telling Kase that "Grace International was an experienced company, when in fact Grace was brand new and had no other clients."  PSR ¶ 76, at 18.  See PSR ¶ 12, at 5.

8.       On July 10, 2008, Jarvis presented Kase with two options for the contract with Grace International: "If Kinesio USA entered a three-year contract, the price per roll would be $1.98, but for a one-year contract, the 'premium' would be higher and the price per roll would be $2.38."  PSR ¶ 23, at 7-8.

9.       Jarvis counseled Kase to take the longer contract.  See PSR ¶ 23, at 7-8.

10.      Despite Jarvis' counsel, Kase opted for the one-year contract because she was not yet comfortable with the manufacturer's quality of tape.  See PSR ¶ 23, at 7-8.

11.      On July 14, 2008, Jarvis sent Hope an electronic mail transmission describing the specifications of the contract between Grace International and Kinesio USA.  See PSR ¶ 24, at 8.

12.      Jarvis predicted that he and Hope would make a considerable profit in the first year of their scheme.  See PSR ¶ 24, at 8; id. ¶ 79, at 18.

13.      The Defendants did not disclose the markup that Grace International charged Kinesio USA and "led Kinesio to believe that the markup charged by Grace International on the tape was insignificant."  PSR ¶ 12, at 5.  See PSR ¶ 77, at 18.

14.     "To conceal their involvement in Grace International, Jarvis and Mr. Hope set up an email address for Grace International and sent emails from that address to personnel at Kinesio."  PSR ¶ 77, at 18.

15.     Hope performed the printing and packaging for Kinesio USA's tape.  See PSR ¶ 27, at 8.

16.     Jarvis' relationship with Kase began deteriorating in 2009.  See PSR ¶ 35, at 10.

17.     Kinesio USA began experiencing problems with the tape's quality.  See PSR ¶ 44, at 11; id. ¶ 81, at 19.

18.     In February 2010, "one of Kinesio's international distribution partners called Tomoko and informed her that Jarvis had offered to sell him Kinesio-like tape directly from the manufacturer, cutting Kinesio out of the process."  PSR ¶ 48, at 12.

19.     On February 15, 2010, Kase fired Jarvis.  See PSR ¶ 48, at 12.

20.     After Jarvis left the company, Kase discovered evidence of Jarvis' scheme.  See PSR ¶ 48, at 12.

21.     On February 25, 2010, Kinesio USA filed a civil complaint against Jarvis and Hope in the County of Bernalillo, Second Judicial District Court, State of New Mexico in Albuquerque.  See PSR ¶ 50, at 12.

22.     The Federal Bureau of Investigation began investigating the Defendants after Kinesio USA discovered that Jarvis committed fraud.  See PSR ¶ 10, at 5.

**2.     Kinesio USA's Losses.**

23.     From July 2008 to January 2010, Kinesio USA placed orders for therapeutic tape with Grace International.  See PSR ¶ 64, at 15.

- 4 -

24.     Kinesio USA never received some orders and had difficulties with the tape's quality.  See PSR ¶ 44, at 11.

25.     The Defendants sent invoices with marked up prices to Kinesio USA, who paid for the orders via international wire transfers from Kinesio USA's bank account in Albuquerque to Grace International's bank, HSBC Bank, located in Hong Kong.  See PSR ¶ 64, at 15.

26.     Kinesio USA paid a total of $5,621,184.24 on purchase orders 1 through 11.  See PSR ¶ 64, at 15.

27.     The products for purchase orders 1 through 11 cost $3,085,814.92 to produce. See PSR ¶ 64, at 15.

28.     Before Kinesio USA discovered the fraud, the Defendants proposed that Kinesio USA enter into a new three-year contract with Grace International that would charge Kinesio USA $5,184,000.00 and deliver a product that cost $3,736,800.00.  See PSR ¶ 66, at 16.[1]

29.     The sum of the intended profit -- contract amount minus costs -- from Purchase Orders 1-11 ($2,535,369.00) and the intended profit from the proposed three-year contract ($1,447,200.00) is $3,982,569.00.

---

[1] The USPO and the United States calculated the amount of the proposed contract using the prices per roll that the Defendants offered to Kinesio USA. Although they failed to object to the USPO's calculation in their Objections, at the hearing the Defendants argued that the contract price for the three-year should be calculated using $1.98 per roll, see Tr. at 24:12-20 (Aaron) -- the price that Jarvis initially offered for a three-year contract in July 2008.  See PSR ¶ 23, at 7-8. The United States presents evidence, however, that the Defendants offered Kase new, higher prices when they presented her with another opportunity to enter into a new three-year contract one year later.  See Tr. at 46:2-12 (Messec).  The USPO and United States used the Defendants' own prices in calculating the contract's overall price, and the Defendants did not dispute these prices until the hearing.  The Court therefore finds that the USPO's and United States' calculation of the three-year contract price is correct.

30.     The USPO credits the Defendants for the value of the services they provided to Kinesio USA by reducing Kinesio USA's loss amount by the value of the Defendants' services, calculated as fifteen percent of the manufacturing costs, or $925,383.00.  See PSR ¶ 68, at 16.

31.     In deriving the value of the Defendants' services, the USPO and United States select a value of fifteen percent for Purchase Orders 4-11.  See PSR ¶ 68, at 16.  It credits the Defendants with a five percent service fee for Purchase Orders 1-2 because another broker -- Firstar -- performed some or all of the brokering work.  See PSR ¶ 68, at 16.  It credits the Defendants with a ten percent fee for Purchase Order 3 because midway through the purchase, Firstar was cut out of the transaction.  See PSR ¶ 68, at 16.[2]

32.     The PSR and the United States select a fifteen-percent service fee based on the service fees that other brokers charge.  Kinesio USA's subsequent broker, DMKK, charged a nineteen percent fee.  See PSR ¶ 67, at 16.  The Defendants suggested limiting the service fee to ten percent for the company who performed the brokering work on purchase orders 1 through 3, Firstar.  See PSR ¶ 67, at 16.  Thus, fifteen percent is a rough average of the two service fees.

33.     Subtracting the value of the Defendants' services ($925,383.00) from the Defendants' intended profit on the three-year contract and Purchase Orders 1-11 yields an intended loss amount of $3,057,186.

34.     Kinesio USA's actual loss is $2,384,349.32.  See PSR ¶ 69, at 16.

35.     The Defendants estimate the amount paid for packaging was approximately $0.15 per roll, for a total of $351,324.01.[3]

---

[2]The Defendants propose using a different method to calculate the value of their services. The Court describes it below, and explains why it selects the United States' method instead.

[3]The Defendants derived the packing costs by:

### 3.     **The Aftermath.**

36.     After Kinesio USA terminated its relationship with Grace International, it used the services of a new broker, DMKK, who charged $1.70 per roll for its brokering services.  See Objections at 3.  This fee did not include freight charges.  See Objections at 3.

37.     Freight charges add approximately ten cents to the cost of a roll of tape.  See Objections at 3.

38.     When the ten cents for freight costs are added to DMKK's cost per roll for its brokering services, it leaves a difference between DMKK's price and Grace International's price of only $0.60 per roll, or twenty-five percent.  See Objections at 3.

39.     In August of 2011, "Jarvis wrote an email to Hope in which he laid out his plans to ruin Kinesio by revealing sensitive information about the company if Kinesio did not settle the lawsuit."  PSR ¶ 54, at 13.

### PROCEDURAL BACKGROUND

On July 11, 2013, the United States filed a 38-count Indictment against Hope and Jarvis in the United States District Court for the District of New Mexico.  It charged the Defendants with: (i) wire fraud and aiding and abetting (Counts 1-21); (ii) conspiracy to commit wire fraud (Count 22); and (iii) unlawful monetary transactions in criminally derived property (Counts 23-28).  See PSR ¶ 2, at 4.  On May 5, 2014, the Defendants pled guilty to Count 22 -- conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 1343.  See PSR ¶ 2, at 4. The applicable guideline for an offense involving Conspiracy to Commit Wire Fraud is U.S.S.G. § 2B1.1.  See U.S.S.G. § 2B1.1.  The base offense level begins at 7 if the defendant was

---

$5,621,184.24 (Total Kinesio USA paid to Grace International)
÷ $2.40 (cost per roll)
= 2.34 million (total rolls of tape) x $0.15 (cost of packaging per roll) = $351,324.02.

convicted of an offense referenced in § 2B1.1 and that offense has a statutory maximum term of imprisonment of 20 years or more.  See U.S.S.G. § 2B1.1.  The USPO added 16 levels under § 2B1.1(b)(1)(I), because the loss exceeded more than $1,500,000.00.  See PSR ¶ 88, at 22.  It added 2 levels under § 2B1.1(b)(10)(C) because the offense involved sophisticated means.  See PSR ¶ 88, at 22.  Hope pled guilty at the change of plea hearing before the Honorable Karen Molzen, United States Magistrate Judge for the District of New Mexico.  See PSR ¶ 74, at 17. Pursuant to a written plea agreement, the United States recommends a 3-level reduction for acceptance of responsibility.  See Revised PSR ¶ 3, at 4.  This led to a total offense level of 22. See PSR ¶ 97, at 23.

1.   **The Defendants' Objections to the PSR's Calculation Method.**

The Defendants contend that the USPO's loss calculations are flawed.  See Objections at 2.  First, they argue that, after Kinesio USA terminated its relationship with Grace International, it used the services of a new broker, DMKK.  See Objections at 2.  "DMKK's Purchase Orders reflect that for the same benchmark roll of tape, Kinesio USA subsequently paid DMKK $1.70." Objections at 3.  The Defendants also allege that their cost of $2.40 per roll included freight charges of ten cents per roll, while DMKK's did not.  See Objections at 3.  When the ten cents per roll is added to DMKK's cost, the Defendants argue it leaves a difference between DMKK's price per roll and Grace International's price per roll of only $0.60 per roll, or twenty-five percent.

The Defendants then argue that Kinesio USA's loss should therefore be calculated as the twenty-five percent extra it paid to Grace International, because Kinesio USA was willing to pay $1.80 per roll to DMKK.  See Objections at 4.  The Defendants contend that, if Kinesio USA was willing to pay $1.80 per roll, then it did not lose as much as the PSR reflects.  See

Objections at 4.  The Defendants maintain: "Given that Kinesio USA paid Grace International 25% more than it subsequently paid DMKK in an arms-length transaction, the fraud loss on Purchase Orders 1-11 is $1,405,296.06, *i.e.*, 25% of $5,621,184.24."[4]  Objections at 4.  Before any other proposed adjustments, the intended loss under the Defendants' calculation is as follows:

| | |
|---|---|
| $5,621,184.00 | Intended Loss for Purchase Orders 1-11 |
| - $4,215,888.00 | Credits Against Loss |
| = $1,405,296.00 | Loss under § 2B1.1(b)(1)  (14 level enhancement) |

Next, the Defendants allege that the loss amount should subtract the cost of packaging, as Hope produced all the packaging and it was not connected to the fraud scheme.  See Objections at 4.  The Defendants estimate the amount paid for packaging was approximately $0.15 per roll, for a total of $351,324.01.  They argue that, subtracting the $351,324.02 packaging costs from the loss number of $1,194,501.65 yields an actual loss of $843,177.63.  See Objections at 4.

The United States responded to the Defendants' Objections on October 26, 2015.  See United States' Sealed Response to Defendants' Objections to the Presentence Reports, filed October 26, 2015 (Doc. 116)("Response").  The United States asserts that the Defendants' methodology "is not supported by the Guidelines" and makes "unjustifiably favorable assumptions on their own behalf."  Response at 1-2.  It states that the Guidelines require the Court to apply a two-step approach to determining the loss under § 2B1.1.  See Response at 5-6. It argues that the Defendants' method is an improper way to value the Defendants' goods and

---

[4]The Court will refer to the Defendants' loss calculation methodology as the comparison method.

services, because "it assumes that the product and services provided by Grace and DMKK were equivalent, which is not the case."  Response at 6.  Additionally, it argues that the Defendants' calculations subtracted the value of their services twice from the loss amount and used other erroneous numbers.  See Response at 8.  Next, it argues that the Court should not subtract Defendant Hope's printing and packing services from the loss amount because it was part of the fraud.  See Response at 9.

### 2.    The Defendants' Objections to the PSR's Intended Loss Calculation.

The Defendants assert that the PSR's intended loss calculation is incorrect because it includes the value of the proposed three-year contract.  See Objections at 6.  The PSR determined that Kinesio USA would have lost $1,447,200 had it entered into a three-year contract with Grace International.  See PSR ¶¶ 67-69.  The Defendants argue that "it defies credulity that Kinesio USA would have entered into a second contract with Grace given how obviously dissatisfied Kinesio USA was with Grace's performance under the initial International Manufacturing Agreement."  Objections at 6.  They argue that, "where the evidence demonstrates that Kinesio USA simply would not have entered into the proposed, three-year contract with Grace, the Court can consider that critically important fact in determining loss."  Objections at 7.  Here, they contend, the offense level substantially overstates the seriousness of the offense.  See Objections at 7.

The United States contends that the Guidelines' plain language directs the Court to "include intended pecuniary harm that would have been impossible or unlikely to occur."  Response at 11.  The United States avers that the Guidelines "focus[] on a defendant's intent to harm, rather than a defendant's success in carrying out criminal plans."  Response at 11.  Here, it asserts, the Defendants intended to harm.  See Response at 11.

3.      **The Hearing**.

The Court held a hearing on November 5, 2015.  See Transcript of Hearing (taken November 5, 2015)("Tr.").  The Defendants first conceded that using the comparison method to calculate the value of their services includes an amount for their compensation.  Given this inclusion, the Defendants admitted that, if the Court also subtracted an additional percentage amount like they suggested, it would improperly compensate them twice.  See Tr. at 22:25-23:3 (Aaron).

The Defendants also stated: "I understand that the Court is not going to . . . grant our motion for a downward departure based on what we believe is the unrealistic expectation that there ever would have been a three-year contract entered into."  Tr. at 23:22-24:2 (Aaron). Additionally, they conceded that none of their further objections would bring Kinesio USA's loss amount under the $1.5 million mark necessary to lower their sentence, but stated that their objections demonstrate that "the Government has run up the score a bit" on the fraud loss calculation.  Tr. at 24:2-9 (Aaron).

The Defendants disputed the United States' calculation of the three-year contract price. They argued that the United States should calculate the cost of the proposed three-year contract by multiplying $1.98 by the number of rolls over the contract's life.  See Tr. at 24:9-14 (Aaron). They based this argument on the fact that when the Defendants originally proposed the three-year contract, they offered a price of $1.98 per roll.  See Tr. at 24:14-20 (Aaron).  The United States responded that it calculated the cost of the proposed three-year contract using the Defendants' updated cost structure, which was offered when they proposed the three-year contract again over a year later.  See Tr. at 36:5-9 (Messec); id. at 46:2-12 (Messec); id. at 54:2-55:24 (Court, Messec)(stating that the Defendants proposed to sell the tape for $2.40 per roll

under the new three-year contract).  Moreover, they argued that the Defendants did not object to the PSR's three-year contract calculations in their Objections.  See Tr. at 35:18-25 (Messec).

The United States then commented on the "generosity" of its method in calculating the value of the Defendants' services.  It stated that crediting the Defendants with a fifteen percent service fee was not arbitrary; rather, it is generous in light of the fact that Kinesio USA paid over $800,000.00 on Purchase Orders 1-11, and never received the product in some cases, or received product that was so defective it was unusable.  See 37:24-38:5 (Messec).  "Grace did not refund the money to compensate them for the defects either.  So to the extent there was a warranty in this contract, it was not something that was worth anything to the victim."  Tr. at 38:5-9 (Messec).  Furthermore, the United States argued that fifteen percent was a fair compensation percentage considering that it was in between the amount that the original broker -- Firstar -- charged for its brokering services, and the amount that DMKK charged for its services.

The Defendants then argued that the cost of packaging should be subtracted from Kinesio USA's loss amount because it was not defective and not part of the fraud.  See Tr. at 47:5-19 (Aaron).  They admitted that the "cost of packing is not going to affect the ultimate guidelines calculation."  See Tr. at 48:2-4 (Aaron).  Nonetheless, they stated that they hoped the Court would consider the packaging's high quality when making its final sentencing decision.  See Tr. at 48:1-25 (Aaron).  The United States responded that, regardless of the packaging's quality, it already accounted for the cost of the packaging in its calculations of the value of the goods the Defendants provided.  See Tr. at 50:20-25 (Messec).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-

473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising

the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C.

§ 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide

sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in

determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C.

§ 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law,
>         and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training,
>         medical care, or other correctional treatment in the most effective
>         manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal
> statute . . . shall be sentenced in accordance with the provisions of this chapter so
> as to achieve the purposes set forth in subparagraphs (A) through (D) of section
> 3553(a)(2) to the extent that they are applicable in light of all the circumstances of
> the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available

sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar

crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth

Circuit have clarified that, while the Guidelines are one of several factors enumerated in

§ 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use

these same departure factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  <u>Kimbrough v. United States</u>, 552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted.  <u>See United States v. Alemendares-Soto</u>, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec.14, 2010)(Browning, J.).  On the other hand, in <u>United States v. Jager</u>, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court found that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

The Court will overrule the Defendants' objections for two main reasons.  First, the PSR's actual loss figure appropriately captures Kinesio USA's loss, while the Defendants' method improperly calculates the value of their services.  Second, the intended loss figure does not substantially overstate the seriousness of the offense.  Thus, the Court overrules the Defendants' Objections.

I.      **THE UNITED STATES' AND PSR'S LOSS CALCULATION BEST CAPTURES KINESIO USA'S LOSS, AND THE DEFENDANTS' METHOD IS IMPROPER.**

The United States' and PSR's loss calculation adheres to § 2B1.1(b)'s requirements.  The method the Defendants propose improperly calculates the value of the Defendants' services.  Accordingly, the Court will not calculate the value of the Defendants' services by using a comparison figure, and it will not reduce the value of the Defendants' printing and packaging services from Kinesio USA's loss amount.

A.      **THE COURT WILL NOT USE THE DEFENDANTS' METHOD OF CALCULATING LOSS BECAUSE IT IMPROPERLY CALCULATES THE VALUE OF THE DEFENDANTS' SERVICES.**

Section "2B1.1(b) increases a defendant's base offense level for fraud according to the amount of the loss."  United States v. Washington, 634 F.3d 1180, 1184 (10th Cir. 2011).  Under § 2B1.1(b)(1), "loss is the greater of actual loss or intended loss."  § 2B1.1 App. Note 3(A).  "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 App. Note 3(A)(i).  Application Note 3(E) requires that the loss amount be reduced by "credits against loss," which accounts for the value of any services the Defendants rendered before Kinesio USA detected the Defendants' fraud.  § 2B1.1 App. Note 3(E).  In other words, "Application Note 3 treats amounts recovered by a fraud victim [or services provided to the victim] . . . as 'Credits Against Loss,' rather than part of the initial 'actual loss' calculation." United States v. Crowe, 735 F.3d 1229, 1237 (10th Cir. 2013).  The Tenth Circuit described the § 2B1.1 calculation as a step-by-step "mathematical equation" in which "loss equals actual loss (or intended loss) minus credits against loss."  United States v. Crowe, 735 F.3d at 1237.

The first step therefore requires the Court to determine the actual or intended loss under Application Note 3(A).  The Defendants proposed a three-year contract with Kinesio USA that never came to fruition.  It proposed to charge Kinesio USA a minimum of $5,184,000.00 for that

- 16 -

contract.  See PSR ¶ 66, at 15.  In addition, the Defendants invoiced Kinesio USA $5,621,184.00 on purchase orders 1 through 11.  See PSR ¶ 64, at 15.  Together, the intended loss adds up to $10,805,184.00, which is greater than the actual loss.

The second step requires the Court to determine credits against loss under Application Note 3(E).  There are two benefits conferred on Kinesio USA: (i) the goods that the Defendants provided to Kinesio USA; and (ii) the services that the Defendants rendered to Kinesio USA -- i.e., the communication and coordination with vendors.  The PSR identifies the value of the goods that the Defendants provided as $3,085,814.92 for purchase orders 1 through 11, see PSR ¶ 64, at 15, and $3,736,800.00 for the proposed three-year contract, see PSR ¶ 66, at 16.  It identifies the value of the services that the Defendants provided as fifteen percent above manufacturing costs for all but the first three purchase orders, where another company -- Firstar -- performed the brokering work.  See PSR ¶ 67, at 16.[5]  This credit results in an offset of $925,383.05 for services rendered on purchase orders 1-10, and intended to be rendered on purchase order 11 and the proposed three-year contract.

The formula the Guidelines mandates yields the loss amount shown in the PSR:

$10,805,184   Intended Loss

- $7,747,998   Credits Against Loss

= $3,057,186   Loss under § 2B1.1(b)(1)

See PSR ¶ 69, at 16-17.

---

[5]The PSR and the United States select a fifteen-percent service fee based on the service fees that other brokers charge.  Kinesio USA's subsequent broker, DMKK, charged a nineteen percent fee.  See PSR ¶ 67, at 16.  The Defendants suggested limiting the service fee to ten percent for the company who performed the brokering work on purchase orders 1 through 3, Firstar.  See PSR ¶ 67, at 16.

The Defendants offer a proxy calculation.  They propose that the Court should derive the value of their services by comparing the price that they charged Kinesio USA to the price that a subsequent broker -- DMKK -- charged.  <u>See</u> Objections at 4.  In other words, they argue that the true value of the goods and services they intended to provide was $4,215,888.00 ($5,621,184 paid - $1,405,296 overcharge).  <u>See</u> Objections at 4; <u>supra</u>, at 4-6.  To derive the value of services Grace International provided based on a comparison to the services DMKK provided, the two companies must be comparable.  The Defendants' approach assumes that the products and services they provided were equivalent to DMKK's.  They were not.  Kinesio USA paid for a different bundle of services when it used DMKK.  DMKK provided both superior products and superior services.  <u>See</u> Tomoko Kase Deposition at 424:1-425:25 (Kase)(taken April 26, 2011), filed October 26, 2015 (Doc. 116-3)("Kase Depo.").  <u>See</u> PSR ¶ 67, at 16 (noting that "the level of service provided by DMKK was higher than that provided by Grace").  Furthermore, the Court concludes that the fifteen percent fee is reasonable and fair, especially considering the fact that Kinesio USA paid for products that it never received, and paid for products that were so defective that it could not sell them.  <u>See</u> PSR ¶ 44, at 11.

The Court also rejects the Defendants' method for a more fundamental reason.  By using the Defendants' method, the Court would reduce the loss amount by a figure that includes the Defendants' profit margin.  The loss amount should not be reduced to account for the Defendants' profit, even if an honest broker would have made a profit on the same deal.  Kinesio USA cares about the quality of the product and services it receives for the price; the broker's profit, whether legitimate or not, should not be included in the value of the services the Defendants provided.  <u>See</u> <u>United States v. Byors</u>, 586 F.3d 222, 226 (2d Cir. 2009)(concluding that expenses that confer nothing of value on the victim should not be offset from the loss).  In

United States v. Byors, the Second Circuit refused to reduce the loss amount for a defendant's legitimate expenditures when they conferred no value on the fraud victim.  See 586 F.3d at 226. The Second Circuit noted that Application Note 3(E)'s plain language does "not require a loss to be offset by any legitimate expenditures, as defendant argues, but rather by 'value' that has been conferred on victims in the form of money or property returned or services rendered."  586 F.3d at 226.  The amount Kinesio USA paid per roll of tape, whether to DMKK or to Grace International, included a profit margin.  Because that profit margin conferred no value upon Kinesio USA, like in United States v. Byors, the Court cannot reduce the loss amount by that amount.  Furthermore, Application Note 3(E) does not include a profit margin for defendants as one of the credits against loss.  See § 2B1.1 App. Note 3(E).  To allow the Defendants to subtract the full price that an honest broker would charge legitimizes some of the profit they fraudulently made.

The Defendants' method is flawed in other ways.  First, in deriving the amount of their product, they select one type of tape as representative of their markup on all products.  See Objections at 4-6.  Instead of comparing the price Grace International charged for the benchmark roll ($2.40) to the price DMKK charged for the same roll in the orders immediately after Kinesio USA terminated Grace International's contract ($1.48 exclusive of shipping), the Defendants use the price DMKK charged more than a year after the last Grace International order ($1.70).  The price increased because of increased manufacturing costs.  See Kase Depo. at 429:3-25 (Kase). A valid comparison would compare the prices that Grace International and DMKK charged when they were closest in time.

Second, the Defendants attempt to doubly discount the services that they rendered by subtracting an additional fifteen percent credit after calculating their overcharge, which they

arrived at by comparing the prices they charged to the prices DMKK charged. See Objections at 4 (subtracting $210,794.41). Those prices, however, already included a service charge. Their methodology of deriving the value of their services to be subtracted bundled the cost of goods sold, the value of services rendered, and the profit earned into one number. Thus, the Defendants propose to subtract the value of their services from the loss amount twice. The Court cannot offset the loss by both the amount an honest broker would have charged for services and by an additional fifteen percent for services rendered by a dishonest broker. The fifteen percent credit for services rendered applies only when the value of the goods and the value of the services are separately calculated. The Defendants conceded this analysis at the hearing. See Tr. at 22:25-23:3 (Aaron).

In sum, the Court will not use the Defendants' method to calculate the intended loss. Kinesio USA's payment price to DMKK reflects the price it was willing to pay for a trusted, valued broker. It might be willing to pay more after having been the victim of a fraud. The price it pays years later -- after experiencing a long-term fraud -- might not reflect the price it would have paid in 2008, and the Court cannot derive the loss figure using that unrealistic comparison. Moreover, it will not offset the intended loss with a figure that includes the Defendants' profit margin -- a number that provides no value to Kinesio USA.

### B.      THE DEFENDANTS ARE NOT ENTITLED TO THE VALUE OF THEIR PRINTING AND PACKAGING SERVICES.

The Court may make a reasonable estimate of the value of legitimate services the Defendants provided for purposes of an offset to the amount of loss. See United States v. Snow, 663 F.3d 1156, 1161 (10th Cir. 2011); United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010). The Court will not subtract Hope's printing and packaging services from the loss amount in addition to subtracting the actual cost of the packaging and a fifteen percent value for services

rendered.   Hope has not shown that his packaging services were "not part of the fraud." Objections at 4.   On the contrary, Hope and Jarvis deceived Kase in obtaining the printing and packaging contract.

Jarvis explained to Kase that Hope "ha[d] nothing to do with the manufacturing process of the tape, nor does he want to be involved in the process."   See Email from John Jarvis to Tomoko Kase at 1 (dated August 5, 2008), filed October 26, 2015 (Doc. 116-5)("Email").   Jarvis stated that Hope's motivation for being involved with the Grace International deal was to secure the printing and packing contract and prevent his competition from obtaining the work.   See Email at 1.   Hope provides no evidence to support his contention that he would have received Kinesio USA's business absent his role in the fraud.   Jarvis admits that printers in China were "a dime a dozen."   Email at 1.   Thus, the Court concludes that the printing and packaging were part of the fraud, and that the costs have already been accounted for because the Court subtracted the value of the packaging and the value of the Defendants' services from the loss amount. Accordingly, the Court will not subtract the value of Hope's printing and packing services from the loss amount.[6]

## II.      THE COURT WILL INCLUDE THE INTENDED LOSS FROM THE THREE-YEAR CONTRACT PURSUANT TO § 2B1.1 APPLICATION NOTE 3(A).

The Guidelines defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," including "pecuniary harm that would have been impossible or unlikely to occur."   § 2B1.1 App. Note 3(A)(ii).   The Guidelines' plain language instructs that intended loss "includes intended pecuniary harm that would have been impossible or unlikely to

---

[6]The Defendants' calculation of the cost per roll is also misleading.   It implies that each roll cost the same to package and ship, even if the rolls varied in size.   The Defendants provide no evidence to support their numbers.   Moreover, even if the Court did subtract the cost of packaging, it would not bring Kinesio USA's loss amount under the $1.5 million threshold needed to reduce the Defendants' sentence.

occur."  App. Note 3(A).  The Guidelines therefore directs courts to include harm that would have been <u>impossible</u>.  In <u>United States v. McBride</u>, 362 F.3d 360 (6th Cir. 2004), the Sixth Circuit stated that only when the defendant's "misperception of the facts [] become[s] so irrational," can the words "'intended loss' [] no longer reasonably apply."  362 F.3d at 374. Here, the Defendants did not misperceive the events.  They fully intended to induce Kinesio USA to enter into the three-year contract.  Thus, even if there was no likelihood that Kinesio USA would enter into the three-year contract, the Guidelines directs the Court to include it in the intended loss amount.

The Defendants point the Court to Application Note 20(C), which states that there may be cases in which the offense level "substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  § 2B1.1 App. Note 20(C).  In <u>United States v. McBride</u>, the Sixth Circuit discussed the possibility of a departure in such a case.  The Sixth Circuit noted that a loss determination may significantly overstate the severity of the offense when: (i) "sentencing is based largely or solely on intended loss"; (ii) the defendant's scheme is "obviously doomed to fail"; and (iii) the fraud "causes little or no actual loss."  362 F.3d at 375.  When that is the case, a "court should therefore consider whether there was any reasonable possibility that the scheme could have caused the loss the defendant intended."  362 F.3d at 375 (internal quotation marks and citation omitted).

This case is dissimilar.  Including the intended loss from the Defendants' proposed contract does not "substantially overstate[] the seriousness of the offense," <u>see</u> App. Note 20(C), especially here, where the Defendants genuinely hoped that Kinesio USA would enter into the contract.  The Guidelines definition of intended loss focuses on a defendant's intent to harm, not on his success or even his likelihood of success in carrying out his criminal plans.  <u>See</u> App.

Note 3(A).  This case meets none of the criteria the Sixth Circuit stated would warrant a downward departure.  First, the sentencing is based on a combination of both actual and intended loss.  Second, the Defendant's scheme was not "obviously doomed to fail"; on the contrary, the Defendants had already succeeded for over a year.  Third, the fraud did not "cause[] little or no actual loss."  362 F.3d at 375.  It caused Kinesio USA a substantial loss of millions of dollars.

Accordingly, this case is unlike the rare situation in which the intended loss does not reflect the situation's economic reality.  The Defendants argue that "it defies credulity that Kinesio would have entered into a second contract with Grace given how obviously dissatisfied Kinesio was with Grace's performance," while at the same time extolling Grace International's numerous positive qualities.  See Objections at 6 n.4 (describing how Grace International was not a mere broker, but provided countless services, including fully warrantying the product, paying all freight and forwarding charges, sourcing the manufacturing facility, carrying out research and development, absorbing all tooling and sampling costs, managing logistics, and securing FDA specification development).  This suggests that Kinesio USA could have opted to overlook the inconsistencies in Grace International's performance because of the additional services Grace International provided.  The Defendants cannot maintain that their performance was so sub-par that no reasonable company could possibly have entered into a new contract, while at the same time arguing that their company had numerous virtues that Kinesio USA valued.  In short, Kinesio USA had complaints with Grace International's performance, but that does not suggest that "there was no reasonable or realistic possibility that Kinesio USA would have entered into the proposed three-year contract," as the Defendants indicate.  Objections at 8.  Accordingly, the Court will overrule the Defendants' objection.

**IT IS ORDERED** that Defendant John A. Hope's Supplemental Objections to the Presentence Investigation Report Regarding Loss, filed October 20, 2015 (Doc. 112), and in Defendant Johannes "John" Jarvis' Notice of Joinder in Defendant Jack Hope's Objection to the Presentence Report, filed October 21, 2015 (Doc. 114), are overruled.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Paige Messec
  Assistant United States Attorney
Albuquerque, New Mexico

     *Attorneys for the United States*

Judson A. Aaron
Conrad O'Brien PC
Philadelphia, Pennsylvania

     *Attorney for Defendant John A. Hope*

Erlinda O. Johnson
Albuquerque, New Mexico

     *Attorney for Defendant Johannes "John" Jarvis*